You've got this device. If this is not working for you, will you let us know and we can adjust the placement of it? Thank you. All right. No, certainly. Welcome. All right. You may proceed. Thank you, Your Honor. May it please the court, my name is Alan Lebensfeld from the firm of Lebensfeld, Schwerin, and Schwartz. My colleague, Larry Schwerin, who tried this case is with me. Your Honor, the simple and direct question presented by this appeal is whether this court can allow a jury verdict to stand based on knowingly perjured and demonstrated testimony, which I'll get into in a moment, the testimony relating to the 100 Las Olas Project. Can this court allow further a jury verdict to stand based on the unjustified exclusion of critical witnesses who would not only have debunked Pliteq's substantive claims, but shown Mr. Downey, their principal, to be an abject liar? And finally, Your Honor, this court must decide whether it will allow a jury verdict to stand where the most critical piece of evidence in the case, without which Pliteq cannot prove causation or its claim, was admitted when it was classic hearsay, simply because, as the judge ruled, and as my adversary repeated in his brief, a document that's received in the regular course of business and kept by the receiver in the regular course of business qualifies as a business record. That could not be any farther from the truth of the law. And finally, Your Honor, just by way of an outline, Pliteq failed to present legally sufficient evidence to establish to a reasonable certainty that a single piece of a single innocuous email was the cause of 1.1 million dollars in especially when the author of this email was not permitted to testify live before the jury and the evidence to prove that there was no causation was missing. Are you talking about Mr. Young? I'm sorry, Your Honor? Are you referring to Mr. Young in that last point about the person not being permitted to be called as a live witness? I'm actually talking about, yes, Mr. Young and then Ms. Yankee, Your Honor. Was Mr. Young listed as a witness by your side? The answer is yes and I'm glad you asked me because the facts with respect to Mr. Young's exclusion just jump out at you as wrong. Let me briefly explain. The month before the trial commenced, Mr. Young was listed as a witness. Mr. Cherone served a subpoena on Mr. Young out of an excess of caution to make sure that he would appear live. Three days before the trial, Your Honor, on April 26, 2018, the parties exchanged their witness list. Pliteq tactically removed Mr. Young from their witness list. At the same time, Mr. Cherone, on behalf of Marge M, listed Mr. Young as a witness. On April 27, the following day, didn't you list Mr. Young as a witness for impeachment or rebuttal purposes only and not on your initial witness list? No, Your Honor. He was listed as a witness for Pliteq. No, I understand. I'm talking about your client. I'm sorry. I'm talking about your client. Can you hear me now? I can. Thank you. Sorry, I apologize. Your client did not list Mr. Young on its initial witness list. That's correct because Pliteq had. No, I understand that, but your client then listed Mr. Young on its impeachment rebuttal witness list. That's correct. After Pliteq withdrew him a couple of days before the trial. I understand that, but isn't that really a trial strategy? They have the right to make a trial strategy. You can put Mr. Young, you could have put Mr. Young on your initial witness list as well. It would have, most respect for you, it would have been redundant. Okay. So we come to April 27th, the next day, Pliteq makes a motion to quash the subpoena on Mr. Young. Judge Williams doesn't decide that issue until the middle of the trial. You have Ms. Yankee and the exclusion of her testimony that would have established that Mr. Young is guilty. When did you seek to enter Ms. Yankee as a witness in the trial? As soon as we fortuitously and serendipitously discovered her existence and her testimony. And when I say serendipitously and why it's synergistic with the error committed with Mr. Young. How did we find out about it? Well, when the judge ruled on May 3, 2018, that Mr. Young could not testify live, the most critical witness in the case, who wrote the email, the single piece of evidence in question that would have disputed facts, your Honor, calls Mr. Young's employer's counsel, Cass, Mr. Utley, and says, I just want to let you know, the judge did not allow Mr. Young to testify live, so he's relieved. And then Mr. Utley fortuitously tells Mr. Rohn, you know, the $100,000 project was not even bid yet. No underlayment contractor has been specified. And Mr. Rohn says, wow, they're contending otherwise. Mr. Downey in court and their expert doubled down on arguing to the jury, they lost $630,000 in profits because, or in the contract, profits actually, because they were not selected for the bid when the bids weren't even sent out yet. So why isn't that something as a, as a party, why isn't that something as a party to the case that it was, it was your client's job to suss out during civil discovery? There's no allegation that any information was hidden or, or any discovery requests not responded to, correct? Yes, there is, Your Honor. There are. And here, let me explain. When, this is what Plytec intends, Your Honor, that Las Olas was, was $100,000 was listed as one of one of 86 profit, projects initially that they potentially would lose the bid. That was subsequently reduced to nine by Mr. Schulte-Kacke. At the time of Mr. Young's deposition, the specs had not been produced for 100 Las Olas. Therefore, neither Mr. Kaplan nor Mr. Schirone asked Mr. Young about them because it wasn't an issue. With respect to, these specs were produced by Kass, Your Honor. Those specs were subpoenaed on July 22nd, 2016. They weren't produced until, by Mr., by Kass' attorney until April 4, 2018, two weeks before the trial, six months after the discovery period, and you ask me if there's some evidence of deception here. Well, Your Honor, Mr. Downey contended that he had a very close relationship with Kass, the general contractor on the 100 Las Olas project. Mr. Downey testified that he learned about the specs from the architect. By the way, the architect who never testified at trial, the developers who never testified at trial, the general contractor who never testified at trial, the only people who could have presented evidence based on personal information as to what caused Plytech allegedly to lose this job. So, in response to your question, I'm sorry, I just wanted to finish. So, there's clear evidence that Downey and Plytech knew before that they were claiming damages on a job that hadn't even been bid yet, but we learned about that two weeks before the trial. Your emphasis is on the 100 Las Olas job, but, I mean, the bigger picture really is that Plytech was seeking $1.683 million in damages. The jury awarded $310,000 in compensatory damages, and they didn't break it down by project. I mean, the verdict form didn't allow them to show which damages they were attributing to which project. Have I got that right? No, you have that right. Judge Williams refused to separate the projects. Did you ask her to? Yes, we did, Your Honor. But, Judge, how do we know why the jury did what they did? In the Sullivan case, of course, the court said, jury is not free to pull a number out of their hat. They asked for $1.6 million of profits based on a precise calculation of damages. We don't know why the jury did what they did, but we know one thing. Had they presented with evidence, as they should have been, that they were asked to award $630,000 on damages for the failure to award the Las Olas contract to Plytech, that not only would have reduced what was before them, but it would have destroyed, literally destroyed, the credibility of Mr. Downey, their principal, who was the only witness, Your Honor, at the trial who testified for the but-for element. And frankly, he shouldn't have been. My colleague did not object, but the judge allowed Mr. Downey to say not only that he didn't get the job, but he didn't get it because of this single email. You are over your time. Yes, thank you. May it please the court, Kevin Kaplan, and with me is Jeffrey Crockett for the Appley Plytech. Mr. Kaplan, can you answer Judge Martin's question regarding the verdict form? Yes. Was that actually objected to below? They did object to the verdict form and request that it be broken out by project. Our position was that it didn't need to be, and that was appropriately to be argued by them in their closing. That ruling was made in our favor, and they didn't appeal that. Okay. There's no mention of that at all anywhere in any of the briefs, so that's a different issue. Certainly, they do appeal the sufficiency of the evidence supporting our damages, which was the basis of their Rule 50A motion at trial as well. The record here demonstrates that the evidence was more than sufficient to support the damages the jury awarded. Factually, the record's full of the evidence about Marjam's malicious intent and its malicious conduct. You don't really need to look even beyond the words that they put in writing in their own emails after the relationship between the parties ended in the summer of 2015. Marjam made clear in writing that it was going to react in an extreme and unpleasant way. It was going to bury Pleitech. It was going to launch a blitzkrieg attack. It was going to take it out of Pleitech's hide and cripple the king, referring to Paul Downey. That was the evidence from Marjam's own words in emails that were never objected to when they were admitted at trial. Then, we know that Marjam actually set out to do what it said it would do. Critically, Marjam's manager, Jim Metcalfe, sent a series of emails, including emails to CAST, which was the construction arm of a major South Florida developer with which Pleitech had a track record of business. We'd already been used on four projects involving CAST where Pleitech had been specified. That evidence was uncontradicted. I don't want to interrupt you, but can you address the delay that your friend at the other table stated for the specs for the project, which were subpoenaed on the 27th of July 2016, I believe, and were only produced on April 4th, 2018, six months after the discovery period? Look, we had a fight with CAST tooth and nail to get the information from them. We had a subpoena them for deposition, and a motion to quash was filed. We had a hearing. We took the deposition, and CAST didn't provide those specs until later. We were also able to get them independently through the architect, SB Architects, and as soon as we obtained them within a matter of days, we provided it to the other side. And this was well in advance of the trial. And I also want to emphasize that those specs came into evidence not just through Mr. Downey's testimony, but our expert, Mr. Shuttlecotty, referenced the 100 loss OLS specs in his testimony as well, which, as an expert, he's allowed to do. And that testimony was given without any objection at all. That's in the record. I'm glad you mentioned that, because it did not seem to me that Mr. Downey's testimony established those as business records. Well, I mean, look, it's a hearsay objection, right? And the case cited by the other side, the Langford case, I think is really instructive on that. It says the touchstone of the business records inquiry is reliability, and the trial court has broad discretion in determining admissibility. Here, the testimony from Mr. Downey, this was docket entry 349. It's pages 76 to 77, 84 and 86 to 87, where he addresses the specs. And he says repeatedly that Plytech received and retained the specifications in the ordinary course of its business. These specifications were prepared by the architect, SB Architects, and that's, in our view, sufficient under this record for the court to have admitted it, and certainly under an abuse of discretion standard in the Langford case, there's no basis for reversing that ruling. But it wasn't within Mr. Downey, not to belabor the point, but it wasn't within Mr. Downey's area of knowledge of how those documents were created? No, and it wasn't, they weren't admitted for that purpose. I mean, in a sense, it's a verbal act. It's not hearsay. It's just the fact that Plytech was specified, not how or why or what led to it. That wasn't the point of the admissibility of the document. So certainly it's within Plytech's business practices and day-to-day operations to receive copies of specifications for projects from the architects and just to be aware of the fact that Plytech had been specified for this 100 loss or less project. And there's no dispute about that. There's nothing in the record at all to question the reliability of that document or the fact that Plytech was specified. But in any event, I believe that objection was raised by Marja at trial, but was that objection reiterated in the motion for new trial? I believe in the motion for new trial is really based on sufficiency of evidence for damages. This is more an evidentiary ruling that falls under the rubric of the new trial motion. Again, under the standard, they cite the McGuinness case on that. A Rule 59 motion, especially where the jury verdict is let to stand by the district court judge, requires deference to the district court judge's decision. And again, with respect to those specs, I want to emphasize the expert who under Rule 703 can rely on hearsay evidence, even if this would be deemed hearsay and we don't think it is. He testified about those specifications in Docket Entry 350, pages 96 to 102, without any objection at all. So the specs are in the record. And of course, the other two sets of specifications were in the clips that Marja and themselves played of the Zach Young deposition. So that demonstrates the reliability of these specifications. And again, it's just the fact that PLYTEC had been specified by the architects for these CAST projects and wasn't used. I just wanted to go back to the sufficiency of the evidence for a second on the damages, because I think that's, I mean, obviously that's the important point to us. And then I'll address the evidentiary rulings to the extent time allows. So we know PLYTEC, this is not a case involving a new business with no track record. The cases relied upon by Marjam are primarily that type of case, like the AlphaMed decision by Judge Altanaga. So here, PLYTEC had a track record with CAST. That's uncontradicted in the record. The testimony was that PLYTEC product was used in all prior CAST projects where it had been specified by the architect. That's Mr. Downey, docket entry 349, page 60, line 15. And then the testimony is also uncontradicted that after the lawsuit, CAST didn't use any PLYTEC product, even when it was specified. And we know PLYTEC was specified on three specific projects. We have that testimony not only from the specs, but from Mr. Downey and from the expert who relied on that. And the evidence at trial showed that Marjam's conduct was responsible for our product not being used by CAST. We have the emails that Marjam sent to CAST. We have the emails that circulated internally inside CAST after Mr. Metcalf's email was received. And then we have Plaintiff's Exhibit 63, the email from Zach Young, who's the vice president of CAST. And as his deposition shows, not a clip that was played, but the depositions in the record as an exhibit to 219, the deposition confirms he's the second in command in South Florida. And his email, this is in writing in an email, in essence it's a smoking gun. He says on no uncertain terms, we're avoiding PLYTEC. So this decision was made at the upper level of CAST by the vice president who's second in command. And as a result of that, no more PLYTEC product is specified. And that vice president even refuses to meet with Mr. Downey or our distributor, IWT Tile. And the unanswered letters that we sent are in the record as well. So based on this conduct, we were blacklisted. And our expert's testimony provides more than a sufficient basis for the amount of damages as well. He started with 86 projects, weeded it down to the three projects where PLYTEC was specifically specified. He did an analysis of the revenues based upon the uncontradicted numbers for the project. He reduced it for the incremental costs that would have been involved in fulfilling the project. And he also applied a discount rate based on a federal index to account for risk. And he arrived at the figure of $1.68 million. That's what we asked for. But there was also evidence in the record that with respect to the Aura Seaside project, where we were the only company specified, that that project involved a loss of $166,000. So there's a range of damages in the evidence between 1.68, our number, and $166,000. The jury comes back with a compensatory damage number of $310,000, which is entirely within that reasonable range. We cited the US v. Sullivan case, which makes clear that a jury's free to listen to the testimony, reject the figures offered by the parties, and arrive at a figure which seems reasonable to it. That's exactly what happened here. And that figure, again, to quote Sullivan, was well within the range of damages that the evidence would support. The GM Broad case, which we cited too, involves similar issues about damages. The court holds the jury's verdict was not beyond the pale of sane judgment, and ours certainly was not either. So let me just address the Ms. Yankee issue here. I mean, as counsel's own argument confirms, she was coming in to provide substantive testimony. She's not an impeachment witness. She's a substantive witness on the basic issue of damage and loss. And she's undisclosed. There's no dispute about this until Sunday evening, before the sixth day of trial, the last day of evidence. So this is a situation where the prejudice to us is going to be pronounced. We haven't had a chance to depose this witness, and we're not going to be able to. And there is no justification at all for the delay. And that's what Rule 37C1 provides. They have to show that the failure to disclose was substantially justified or is harmless. And they didn't show either here. It was no abuse of the trial court's discretion to refuse her to allow her to testify. And again, just to put this in context, Mr. Young, the vice president who made the decision at the upper corporate level, this is a project manager who's presumably going to come in based on her affidavit, which was filed later, not before the court at the time. She's going to come in and testify that it is possible that Plytech may be submitted. That's docket entry 30910, page 3, paragraph 6. I mean, this is not what Marjam seeks to color it as. There's no good reason for the disclosure. In fact, Zach Young was specifically asked at his deposition about the status of the Los Olas project, and he testified that construction had not started. And yet, they neglected even to play that clip. And in fact, at deposition, Mr. Young was questioned about the status of every single cast project. That's in the record 219-9, and it's throughout his testimony, beginning on page 55, 72 to 80. So they knew this. All they had to do is drive by the project in Fort Lauderdale, and Mr. Metcalf could have testified about that, or they could have asked Mr. Downey about that, but they didn't. They didn't cross-examine him at all as to the status of construction of cast and we were blacklisted at the upper corporate levels. We weren't going to get any cast project, and we didn't get 100 Los Olas anyway. I guess my time's up. I'm happy to address any further questions. We appreciate the argument. Thank you. Thank you. Your Honor, I believe if you review the deposition transcript of Mr. Young, you will find that he was not asked about 100 Los Olas, and with respect to the other projects he testified, it wasn't Cass' decision what underlayment product to use. It was the decision of either the architect, the developer, or the owner. And it's interesting that Mr. Kaplan just reiterated the fact that Mr. Downey spoke to the architect. Mr. Downey had this relationship with Cass. He spoke to the architect. He knew that 100 Los Olas was not even bid yet, yet they presented to the jury knowingly false testimony. I notice that Mr. Kaplan has failed to address that. I don't think you are as well. Let me answer a few of his other points. The specs, the admissibility of the specs. I heard Mr. Kaplan say that it was put in by Mr. Downey, which, by the way, he states in his brief that my colleague failed to object to only one of the specs coming in, one of the three project specs coming in. That's not true. He objected to all three. And the site to that, Your Honor, is at page 1,919 of the record, tab 349 at page 84. So that's not true. My colleague objected. But then he says Mr. Schultekacki also confirmed the authenticity of the specs. Mr. Schultekacki was only a damage expert. He took what Mr. Downey said and then determined the amount of damages. But he also compounded the error of Mr. Downey's testimony that was let in and, yes, unobjected to by my colleague, in which Mr. Downey said, but for that email, the project would have awarded to me. So he doubled down on that. And ironically, this is why I said earlier about the synergy and confluences here, had Young been allowed to testify, he would have told the jury live and in person, and, yes, in this day and age, it was at the judge's discretion for sure, but in such a critical piece of evidence. The only hard piece of evidence they had, that they were not awarded the contract because of what Marjam did, the key witness was not allowed to testify live. Now, with respect to... ..Mr. Kaplan's argument that after the lawsuit, Cass didn't use Plytech. Well, Ms. Yankee, in the certification that was submitted in support of her application to let her testify, actually said that Plytech was being considered at that very moment for the job. And she would have testified, had she been permitted to, as she said in her certification or affidavit or declaration, that email from Marjam would have had no effect on whether the developer or the architect would have selected Plytech. Of course, there were alternate products. Plytech, SoundSeal, and any other were equivalent. Mr. Kaplan says that Young was the second in command and that my client could simply have driven by the project to know that the bid for the underlayment on the floor hadn't been selected. I think just stating that proposition answers itself. Mr. Young was not asked about the Los Olis project when he was deposed in 2017 because the specs had not been issued and the specs had not been produced to my client. So that is not accurate as well. Your Honor, I'll end by saying that if you step back from the fray, you look at the question, what was the evidence that an email from Cass written many months before these contracts were awarded caused them not to get these contracts when there were alternatives and the people who made those decisions didn't testify? What was the evidence? You know, Mr. Kaplan, my adversary remarks in his brief that the test is not the greater weight of evidence in terms of a new trial. It's whether there was sufficient... the weight of the great evidence. Well, I submit to you there was no evidence. No evidence of causation. Thank you. Thank you.